ORIGINAL

Approved: _____
Katherine Cheng
Assistant United States Attorney

Before:      THE HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                              :
UNITED STATES OF AMERICA                                       :
                                                              :
            - v. -                                            :
                                                              :
RYAN FISHOFF,                                                 :
                                                              :
            Defendant.                                        :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# 23 MAG 2123

23 Mag.

Rule 5(c)(3)
Affidavit

SOUTHERN DISTRICT OF NEW YORK, ss.:

ZACHARY WILLIAMS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

On or about March 8, 2023, the United States District Court for the Northern District of Ohio issued a warrant for the arrest of "Ryan Fishoff" on charges of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and wire fraud in violation of 18 U.S.C. § 1343. A copy of the warrant is attached hereto as Exhibit A and incorporated by reference herein.

I believe that RYAN FISHOFF, the defendant, who was taken into the custody of the FBI in the Southern District of New York today is the same individual as the "Ryan Fishoff" who is named in the warrant issued by the United States District Court for the Northern District of Ohio.

The bases for my knowledge and for the foregoing charge are, in part, as follows:

1.      I am a Special Agent with the FBI. This affidavit is based upon my personal participation in this matter, as well as on my conversations with other law enforcement officers and my examination of documents, reports, and records. I have been personally involved in determining whether RYAN FISHOFF, the defendant, is the same individual as "Ryan Fishoff" named in the March 8, 2023 warrant issued by the United States District Court for the Northern District of Ohio. Because this Affidavit is being submitted for the limited purpose of establishing the identity of the defendant, I have not included in this Affidavit each and every fact that I have learned. Where I report statements made by others, those statements are described in substance and in part unless otherwise noted.

1

2.      Based on my review of documents from proceedings in the United States District Court for the Northern District of Ohio, I know that on or about March 8, 2023, the United States District Court for the Northern District of Ohio issued a warrant for the arrest of "Ryan Fishoff" (the "Warrant"). The Warrant was issued on charges of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and wire fraud in violation of 18 U.S.C. § 1343.

3.      On March 15, 2023, at approximately 6:00 a.m., I along with other law enforcement officers arrived at an apartment (the "Apartment") in Manhattan, New York.

4.      Based on my review of cellphone location data and law enforcement records, as well as my conversations with law enforcement officers and other individuals, I know that the Apartment is located at the same address where "Ryan Fishoff" resides. Specifically, "Ryan Fishoff" is listed on the lease of the Apartment, and I also confirmed with the Apartment's building management on or about March 13, 2023 that "Ryan Fishoff" presently resides in the Apartment. Furthermore, I reviewed cellphone location data for the phone number listed in the Warrant for "Ryan Fishoff," which showed that he was at the Apartment on multiple occasions, including most recently on or about March 15, 2023.

5.      After arriving at the Apartment on the morning of March 15, 2023, I learned from speaking with the superintendent of the building, who had spoken with the building doorman, that "Ryan Fishoff" had recently left the Apartment. I called the phone number for "Ryan Fishoff" that is listed in the Warrant, and an individual named "Ryan Fishoff" answered, stating that he was on his way to the airport. I informed him that I had a warrant for his arrest and instructed him to go to 26 Federal Plaza, in Manhattan, New York.

6.      At approximately 7:15 a.m. on March 15, 2023, RYAN FISHOFF, the defendant, surrendered at 26 Federal Plaza, and he was taken into FBI custody. During his arrest, in which I participated, RYAN FISHOFF provided a New York state driver's license bearing his name, and he verbally provided his date of birth and social security number, both of which matched the date of birth and social security number contained in the Warrant.

7.      In addition, I believe that RYAN FISHOFF, the defendant, is the same person as the "Ryan Fishoff" listed in the Warrant because the appearance of RYAN FISHOFF when he was taken into custody is identical in appearance to the images of "Ryan Fishoff" I have reviewed, which consisted of photographs of "Ryan Fishoff" from prior arrests and those that I received from the investigating agents in Ohio who obtained the Warrant for "Ryan Fishoff."

8.      Shortly after RYAN FISHOFF, the defendant, was arrested, another agent and I obtained and ran his fingerprints through Live Scan, and the fingerprints of RYAN FISHOFF matched those of "Ryan Fishoff."

WHEREFORE, I respectfully request that RYAN FISHOFF, the defendant, be imprisoned or bailed, as the case may be.

2

Zachary Williams
Special Agent, FBI

Sworn to before me this
15 th day of March 2023

THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

3

EXHIBIT A

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

### for the

### Northern District of Ohio

RECEIVED

2023 MAR -9  P 12: 03

U.S. MARSHALS
CLEVELAND, OH

| | |
|---|---|
| United States of America<br>v.<br><br>RYAN FISHOFF<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>**1:23 CR 144.** |

## ARREST WARRANT

To:     Any authorized law enforcement officer

        **YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     Ryan Fishoff                                                                                      ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment          ☐ Superseding Indictment          ☐ Information          ☐ Superseding Information          ☐ Complaint
☐ Probation Violation Petition          ☐ Supervised Release Violation Petition          ☐ Violation Notice          ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 371 (Conspiracy to Commit Securities Fraud); 18 U.S.C. § 1343 (Wire Fraud)

Date:     03/08/2023

*Issuing officer's signature*

City and state:     Cleveland, OH

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____<br>at *(city and state)* _____ . |

Date: _____

*Arresting officer's signature*

*Printed name and title*

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:    Ryan Fishoff

Known aliases:

Last known residence:    244 Madison Ave, Apt 15b, New York

Prior addresses to which defendant/offender may still have ties:

Last known employment:

Last known telephone numbers:    203-260-6093

Place of birth:

Date of birth:    04/08/1984

Social Security number:    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

Height:    65"          Weight:

Sex:    Male          Race:    White

Hair:    Brown          Eyes:    Blue

Scars, tattoos, other distinguishing marks:

History of violence, weapons, drug use:    None

Known family, friends, and other associates *(name, relation, address, phone number)*:

FBI number:

Complete description of auto:

Investigative agency and address:    FBI; Special Agent Anthony Fry (216-704-7707) AFRY@fbi.gov; Special Agent
Catherine Broomfield (617-874-7248) CLBROOMFIELD@fbi.gov

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:

Date of last contact with pretrial services or probation officer *(if applicable)*:

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

RECEIVED

for the

Northern District of Ohio

2023 MAR -9 P 12: 03

U.S. MARSHALS
CLEVELAND, OH

| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| RYAN FISHOFF | ) | **1:23 CR 144.** |
| | ) | |
| _Defendant_ | ) | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
_(name of person to be arrested)_   Ryan Fishoff
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment ☐ Superseding Indictment ☐ Information ☐ Superseding Information ☐ Complaint
☐ Probation Violation Petition ☐ Supervised Release Violation Petition ☐ Violation Notice ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 371 (Conspiracy to Commit Securities Fraud); 18 U.S.C. § 1343 (Wire Fraud)

Date:     03/08/2023

_Issuing officer's signature_

City and state:     Cleveland, OH

_Printed name and title_

| Return | | |
|---|---|---|
| This warrant was received on _(date)_ _____, and the person was arrested on _(date)_ _____ at _(city and state)_ _____. | | |
| Date: _____ | _Arresting officer's signature_ | |
| | _Printed name and title_ | |

AO 442 (Rev. 11/11) Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:     Ryan Fishoff

Known aliases:

Last known residence:     244 Madison Ave, Apt 15b, New York

Prior addresses to which defendant/offender may still have ties:

Last known employment:

Last known telephone numbers:     203-260-6093

Place of birth:

Date of birth:     04/08/1984

Social Security number:     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

Height:     65"                                          Weight:

Sex:     Male                                            Race:     White

Hair:     Brown                                          Eyes:     Blue

Scars, tattoos, other distinguishing marks:

History of violence, weapons, drug use:     None

Known family, friends, and other associates *(name, relation, address, phone number)*:

FBI number:

Complete description of auto:

Investigative agency and address:     FBI; Special Agent Anthony Fry (216-704-7707) AFRY@fbi.gov; Special Agent
Catherine Broomfield (617-874-7248) CLBROOMFIELD@fbi.gov

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:

Date of last contact with pretrial services or probation officer *(if applicable)*:

≂⁰³ FD

MAR - 8 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **INDICTMENT** |
| ) | |
| Plaintiff, ) | **1:23 CR 144.** |
| ) | |
| v. ) | CASE NO._____ |
| ) | |
| AMERICAN PREMIUM WATER ) | Title 15, United States Code, |
| CORPORATION, a.k.a. "HIPH" ) | Sections 78j(b), 78ff; Title 18, |
| ALFRED CULBRETH, ) | United States Code, Sections |
| RYAN FISHOFF, ) | 371, 1343, and 2; Title 17, |
| CHRISTIAN STOLZ, ) | Code of Federal Regulations, |
| ZACHARY DAVIS, ) | Section 240.10b-5 |
| MARK GUMBEL ) | |
| LORENA MORENO, ) | **JUDGE CALABRESE** |
| ) | |
| Defendants. ) | |

GENERAL ALLEGATIONS

At all times material to this Indictment:

1.     Defendants AMERICAN PREMIUM WATER CORPORATION ("HIPH"),

ALFRED CULBRETH, RYAN FISHOFF, CHRISTIAN STOLZ, ZACHARY DAVIS, MARK

GUMBEL, LORENA MORENO, and others engaged in a criminal scheme when they conspired

and agreed to defraud investors and potential investors in HIPH by issuing millions of shares to

themselves at little or no cost and then artificially controlling the trading volume and price of the

shares to sell the stock and enrich themselves, causing losses to investors in the Northern District

of Ohio, and elsewhere.

## I.    Relevant Regulatory Principles and Definitions

2.    "Microcap" or "penny" stocks were stocks of publicly traded U.S. companies that have low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that are traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

3.    Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to: (a) the United States Securities and Exchange Commission ("SEC") in publicly available filings; (b) brokerage firms and transfer agents involved in the purchase and sale of stock in the companies subject to SEC regulations; and (c) the public. Federal securities laws and regulations also prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

4.    The term "affiliate" in the Securities Act of 1933 included any person directly or indirectly controlling or controlled by, or any person under direct or indirect common control with, the issuer.

5.    A "convertible note" was a debt security issued by a company that provided the holder of the convertible note the right, in certain circumstances, to convert the note into equity shares in the company.

6.    A "call room" or "boiler room" was a commercial operation that identified prospective investors, contacted them by telephone and email, and encouraged them to purchase, and subsequently not to sell, securities.

2

7. The federal securities laws required paid promoters to disclose who paid them for the promotion, the amount, and the type of payment; it similarly required brokers to disclose any commissions they would earn from third parties if they brokered a sale of stock. Promoters and brokers who engaged in stock manipulation often failed to disclose to investors commission payments from third parties, including payments from issuers and affiliates, which was considered an omission of a material fact as part of a securities transaction under federal securities law.

8. A "match trade" was a purchase and a sale of stock that was prearranged so that the purchase and sale orders matched each other in price, volume, and time of execution. This arrangement fraudulently increased the trading volume of the stock and allowed the seller to sell stock when, without such an arrangement, there would not be market demand for the stock.

9. A "pump-and-dump" scheme was a scheme where a group of individuals who controlled the free trading or allegedly unrestricted stock—also referred to as the "float"—if a microcap company fraudulently inflated the share price and trading volume of the targeted public company, through, among other ways, matched trades, false and misleading SEC filings, press releases, and paid stock promotions. Those individuals who conducted stock promotions were often paid promoters or company insiders and affiliates who stood to gain by selling their shares after creating a buying frenzy and pumping up the stock price. When the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain. The promoters, insiders, and affiliates made profits for themselves while creating losses for unsuspecting investors.

## II. **Defendants**

10. HIPH was a publicly traded Nevada corporation and was registered on or about February 17, 1998, with its principal place of business in Playa Vista, California. HIPH's

business purportedly produced high alkaline bottled water and cannabidiol (CBD) infused water. The company's stock traded on Over-the-Counter ("OTC") Markets under the ticker HIPH.

11.     CULBRETH was a resident of Florida; and at times, CULBRETH was the CEO and Chairman of HIPH. CULBRETH issued and controlled a substantial number of outstanding, preferred, and free-trading shares of HIPH though family members, co-conspirators, and associates over which he had influence and control. CULBRETH coordinated and paid stock promoters to inflate the trading volume and share price of HIPH, caused others to pay stock promoters, did not disclose the payments, directed and managed insider and affiliate sales of HIPH stock, and fraudulently sold HIPH stock for his benefit and the benefit of friends, co-conspirators and family members.

12.     FISHOFF was a resident of New York; and at times, he was the CEO of HIPH. FISHOFF controlled a substantial number of outstanding, restricted, and free-trading shares of HIPH through his personal companies, co-conspirators, and associates over which he had influence and control. FISHOFF coordinated and paid stock promoters to inflate the trading volume and share price of HIPH, caused others to pay stock promoters, did not disclose the payments, and directed and managed insider and affiliate sales of HIPH stock as CEO.

13.     STOLZ was a resident of Florida. STOLZ worked as a stock promoter and ran a call room to solicit potential investors to purchase shares in HIPH. STOLZ received payments in cash and stock to promote HIPH without disclosing that he was being paid by HIPH insiders and affiliates. He also placed manipulative trades in HIPH for the purpose of increasing HIPH's share price and was aware that HIPH, CULBRETH, FISHOFF, and DAVIS were directing and managing the sale of stock held by co-conspirators, who he knew were affiliates of HIPH.

14.     DAVIS was a resident of California; and DAVIS was, at one time, CEO of HIPH. DAVIS controlled a substantial number of outstanding, restricted, and free-trading shares of HIPH for his own benefit and the benefit of co-conspirators who directed him when and to whom to sell stock. DAVIS paid stock promoters to inflate the trading volume and share price of HIPH.

15.     GUMBEL was a resident a resident of New York; and GUMBEL operated Artstistic Ventures [sic], which controlled a substantial number of outstanding, preferred, and free-trading shares of HIPH. GUMBEL introduced stock promoters to CULBRETH, paid stock promoters to inflate the trading volume and share price of HIPH and misrepresented his status as a non-affiliate to sell HIPH for his and others' benefits.

16.     MORENO was a resident of Florida; and MORENO controlled a substantial number of outstanding, preferred, and free-trading shares of HIPH in her own name and the name of a family member. MORENO paid stock promoters to inflate the trading volume and share price of HIPH and took direction from FISHOFF and CULBRETH regarding when to sell stock. MORENO sold shares of HIPH for her own benefit and paid kickbacks to CULBRETH and others, while misrepresenting her status as an affiliate of HIPH.

III.    **The Manipulation of HIPH Stock**

A. Fraudulently concealing ownership of HIPH stock

17.     On or about October 10, 2013, CULBRETH obtained control of the public shell company, Expert Group Inc., caused it to change its name to American Premium Water Corporation, and executed the acquisition and merger of businesses with the shell to create HIPH as a publicly traded company.

18.     As a preliminary step of the fraud, CULBRETH issued preferred shares of HIPH to himself, GUMBEL, MORENO, and others through using a variety of methods, including employment and consulting agreements, gifts, and convertible promissory notes.

19.     The HIPH preferred shares that CULBRETH, MORENO, GUMBEL, and others controlled were not subject to the same terms as other HIPH stock; when the conspirators caused reverse stock splits that significantly reduced the number of outstanding HIPH common shares and their value, the Defendants' preferred shares were unaffected by the stock split—significantly increasing their value.

20.     The Defendants provided false, incomplete, and fraudulent information to attorneys to obtain legal opinions under Title 17, Code of Federal Regulations, Section 230.144, et al., often referred to as Rule 144 that stated the shares met legal requirements for deposit and sale on the open market. These Rule 144 legal opinions contained misrepresentations concerning the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material misrepresentations. The Defendants, and others, provided these Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements for depositing the stock and lifting share restrictions.

21.     Defendants CULBRETH, FISHOFF, DAVIS, GUMBEL, and MORENO falsely claimed the shares to be deposited in their own or another's name were obtained through bona-fide arms-length transactions with the issuer, HIPH, and that the Defendant or co-conspirator attempting to deposit (the "depositor") the stock for sale was not an affiliate of the company, when in truth and fact, as they then well knew, the depositors were affiliates of HIPH and were acting in concert with its officers and directors.

B.  Engaging in manipulative techniques to manufacture price movements and trading volume

22.     After obtaining control of substantial amounts of stock, the Defendants fraudulently engineered price movements and trading volume in HIPH stock by coordinating the

6

sale of large blocks of shares timed with the issuance of press releases and paid solicitation of public investors.

23.     CULBRETH, MORENO, GUMBEL, and others paid stock promoters and media companies to promote HIPH at the same time they, co-conspirators, and others were depositing large blocks of shares to sell into the market.

24.     STOLZ, and others, used manipulative stock trading techniques, such as match trades and "painting the tape" (executing small trades at or near close to market close) to artificially inflate or stabilize the share price of HIPH.

25.     CULBRETH, FISHOFF, DAVIS, and others caused the creation and release of favorable press releases and other information to promote HIPH, including claims that one of their water products had various health benefits including that it "May Prevent Cancer," "Prevent[ed] Brain Damage," and "Relieve[d] Pain."

26.     Press releases were provided to co-conspirators and stock promoters in advance of their public release to facilitate third-party stock promotions.

   C.  Paying kickbacks and undisclosed commissions to unregistered brokers, call rooms, and high-pressure salespeople

27.     CULBRETH, FISHOFF, DAVIS, GUMBEL, MORENO, and others paid undisclosed commissions and kickbacks to co-conspirators, including STOLZ and other stock promoters, who helped facilitate the sale shares of HIPH. Investors who purchased stock after being solicited by STOLZ and others were not aware of compensation being paid by the co-conspirators to the unregistered broker, call room, or salesperson.

28.     "Kickbacks" were paid to co-conspirators in a variety of ways, including but not limited to, undisclosed commissions for selling shares, retainage of illicit proceeds, and heavily discounted blocks of shares so the co-conspirator could also profit from the manipulated stock.

## IV.   Relevant Entities, and Bank Accounts

29.    The following table lists entities relevant to this Indictment, the State of

registration, and the Defendant or co-conspirator in actual control of the entity, and its general

role in the fraud scheme:

| Entity | State of Registration | *De Facto* Control of Entity | General Role in the Offense |
|---|---|---|---|
| Stewardship LLC ("Stewardship") | Florida | CULBRETH, CULBRETH-Family-Members 1 & 2 | Used by CULBRETH, CULBRETH-Family-Member ("FM") 1 & 2 to receive and sell HIPH stock without disclosure of CULBRETH's connection to company principals |
| New Age Media Relations II ("New Age Media") | Florida | STOLZ | STOLZ's "boiler-room"/call room that employed high-pressure salesmen to solicit market participants to invest in HIPH |
| L'Alpina USA Inc. ("L'Alpina") | Florida | CULBRETH | Used by CULBRETH to receive and sell HIPH stock without disclosure of his ownership and control of HIPH |
| Kingsfish Ventures Inc. ("Kingfish") | New York | FISHOFF | Used by FISHOFF to receive fraud proceeds and pay stock promoters |
| Artstistic Ventures, Inc. (Artstistic Ventures) | Florida | GUMBEL | Used by GUMBEL to sell and receive HIPH stock without disclosing his affiliate status |
| Tactical Holdings Corp ("Tactical Holdings") | Florida | Call Room Operator 1 | call room/boiler room that employed high-pressure salespeople to solicit market participants to invest in HIPH |

30.    The following table lists bank and brokerage accounts established in the names of

the relevant entities, which were used to facilitate the securities fraud scheme:

| Entity/Person on the Account | Financial Institution / Brokerage | Last 4 of Account | Authorized Signer(s) |
|---|---|---|---|
| Stewardship | TD Bank | x9702 | CULBRETH-Family-Members 1 & 2 |
| Stewardship | Alpine Securities | x3297 | CULBRETH-Family-Members 1 & 2 |
| Stewardship | Alpine Securities | x9406 | CULBRETH-Family-Members 1 & 2 |
| New Age Media | J.P. Morgan Chase | x9878 | STOLZ |
| New Age Media | TD Bank | x6596 | STOLZ |
| Kingfish | Capital One | x1309 | FISHOFF |
| American Premium Water Corporation | Bank of America | x3890 | CULBRETH and another individual |
| Artstistic Ventures | Wilson-Davis & Company | x2260 | GUMBEL |
| Artstistic Ventures | Suntrust Bank | x6377 | GUMBEL |
| L'Alpina USA Inc | Alpine Securities | x5313 | CULBRETH |
| L'Alpina USA Inc | Bank of America | x5480 | CULBRETH and CULBRETH-Family-Member 1 |
| L'Alpina USA Inc | J.P. Morgan Chase | x6961 | CULBRETH and CULBRETH-Family-Member 1 |
| Tactical Holdings | Bank of America | x0245 | Call Room Operator 1 |

31.     The following table lists bank and brokerage accounts established in the names of

individuals, which were used to facilitate the schemes outlined below:

| Entity/Person on the Account | Financial Institution / Brokerage | Last 4 of Account |
|---|---|---|
| CULBRETH and CULBRETH-Family-Member 1 | Delta Community Credit Union | x6805 |

| Entity/Person on the Account | Financial Institution / Brokerage | Last 4 of Account |
|---|---|---|
| CULBRETH-Family-Members 1 & 2 | Bank of America | x8189 |
| CULBRETH-Family-Member 1 | Merrill Lynch | x5X99 |
| DAVIS | Bank of America | x0456 |
| DAVIS | First Entertainment Credit Union | x1767 |
| MORENO | Alpine Securities | x6468 |
| MORENO | Wells Fargo | x5969 |
| MORENO | Wilson-Davis | x2588 |
| MORENO | Wells Fargo | x2289 |
| STOLZ | Bank of America | x3676 |
| A co-conspirator | Wilson-Davis | x2657 |
| GUMBEL | Merrill Lynch | x5Z20 |

## V.    Executions of the Scheme

32.    From in or around 2013 to in or around 2019, the Defendants repeatedly set up and executed pump-and-dump schemes that resulted in substantial losses to investors who were misled by the Defendants.

### A.    February 2014 - December 2015

33.    On or about February 21, 2014, CULBRETH, as CEO of HIPH, caused a 1-for-1000 reverse split in HIPH, which meant that an investor with 1000 common shares of HIPH valued at .0001¢ per share would be issued 1 share with a value of .10¢ per share. However, preferred shares, which were convertible to common shares, were not subject to the split. Therefore, an investor with 1000 preferred shares valued at .0001¢ per share before the reverse

split, who then subsequently converted to common shares, would own 1000 common shares at .10¢ per share afterward.

34.     From on or about April 2, 2014 to on or about April 4, 2014, an account in the name of L'Alpina (a private entity controlled by CULBRETH) held at Alpine Securities sold 40,000 HIPH shares for proceeds of $47,336.

35.     On or about April 4, 2014, CULBRETH caused a License Agreement between HIPH and L'Alpina to be executed.

36.     On or about April 10, 2014, CULBRETH and CULBRETH-Family-Member 1 caused the filing of an amendment that purported to transfer control of L'Alpina to CULBRETH-Family-Member 1.

37.     From on or about April 11, 2014 to on or about May 7, 2014, Call Room Operator 1 transferred approximately $93,000 in HIPH stock proceeds to a bank account they controlled; of that amount, approximately $47,747.64 was paid to a third-party for promoting HIPH, and approximately $42,000 was transferred to HIPH bank account x9815.

38.     From in or around May 2014 to in or around July 2015, CULBRETH, GUMBEL, CULBRETH-Family-Member 1, MORENO, and others deposited and caused the deposit of HIPH shares into brokerage accounts with the purpose of selling the stock, while it was being promoted. Proceeds of the sales were transferred to accounts to enrich the conspirators, to pay for promotion and to pay kickbacks to unregistered brokers, boiler-rooms, and salesmen.

a. On or about May 13, 2014, GUMBEL caused the deposit of 360,000 HIPH shares into Merrill Lynch account x5Z20.

b. On or about May 15, 2014, CULBRETH-Family-Members 1 & 2 caused the deposit of 500,000 shares of HIPH into Merrill Lynch account x5X99.

11

c. On or about June 25, 2014, CULBRETH-Family-Members 1 & 2 caused the wire transfer of $52,133 of HIPH sale proceeds from Stewardship's brokerage account x5X99 at Merrill Lynch to account x8189 to pay for the promotion of HIPH.

d. On or about June 25, 2014, CULBRETH-Family-Members 1 & 2 caused the payment of $52,123 from account x8189 at Bank of America to Call Room Operator 1 controlled account x0245 for the promotion of HIPH.

e. On or about June 26, 2014, GUMBEL caused the deposit of 140,000 shares of HIPH into Merrill Lynch account x5Z20.

f. On or about July 16, 2014, GUMBEL caused the payment of $45,000 from Merrill Lynch account x5Z20 to Call Room Operator 1 controlled account x0245 for the promotion of HIPH.

g. On or about August 7, 2014, CULBRETH-Family-Members 1 & 2 caused the payment of $77,400 from account x8189 at Bank of America to Call Room Operator 1 controlled account x0245 for the promotion of HIPH.

h. On or about August 28, 2014, CULBRETH caused the payment of $13,300 from HIPH account x9815 at J.P. Morgan Chase Bank to Call Room Operator 1 controlled account x0245 for the promotion of HIPH.

i. On or about September 2, 2014, GUMBEL caused the deposit of 300,000 shares of HIPH into Merrill Lynch account x5Z20.

j. On or about September 17, 2014, MORENO caused the payment of $38,440 from account x0898 to Call Room Operator 1 controlled account x0245 for the promotion of HIPH.

12

k. On or about April 9, 2015, CULBRETH caused the filing of an amended annual report

for L'Alpina adding CULBRETH as the President and CEO in place of a family member.

l. On or about July 2, 2015, CULBRETH-Family-Members 1 & 2 caused the deposit of

1,000,000 HIPH shares into Stewardship's Alpine Securities account x3927.

39.     From in or around April 2014 to in or around December 2015, CULBRETH,

CULBRETH-Family-Member 1, MORENO, GUMBEL, and others received approximately

$4,551,308.72 in HIPH stock sale proceeds from the fraud.

B.     February 2016 – February 2018

40.     From in or around July 2015 to in or around February 2018, CULBRETH,

CULBRETH-Family-Member 1, GUMBEL, FISHOFF and others worked to create, amass, and

deposit large blocks of shares that they could then sell when the stock was ready to be promoted.

a. On or about March 4, 2016, CULBRETH-Family-Members 1 & 2 caused the deposit

of 1,000,000 HIPH shares into Stewardship's Alpine Securities account x3927.

b. On or about October 3, 2016, CULBRETH-Family-Members 1 & 2 caused the deposit

of 7,220,000 HIPH shares into Stewardship's Alpine Securities account x3927

c. On or about July 13, 2017, CULBRETH caused a 1-for-5000 reverse stock split for

HIPH.

d. On or about August 31, 2017, GUMBEL caused the payment of $6,000 and $500 to

STOLZ controlled New Age Media account. The memo line on the payments read "IR

FOR HIPH."

e. On or about September 29, 2017, CULBRETH-Family-Members 1 & 2 caused the

deposit of 2,800,000 HIPH shares into Alpine Securities account x3927 in the name of

Stewardship.

13

f. On or about October 26, 2017, CULBRETH caused FISHOFF to be hired as the CEO of HIPH.

g. On or about November 27, 2017, CULBRETH-Family-Members 1 & 2 caused the deposit of 4,000,000 HIPH shares into Stewardship's Alpine Securities account x3927.

h. On or about January 16, 2018, CULBRETH-Family-Members 1 & 2 caused the deposit of 6,000,000 HIPH shares into Stewardship's Alpine Securities account x3927.

i. On or about February 22, 2018, CULBRETH-Family-Members 1 & 2 caused the deposit of 6,400,000 HIPH shares into Stewardship's Alpine Securities account x3927.

j. On or about February 27, 2018, FISHOFF, CULBRETH, and CULBRETH-Family-Member 2 had an email exchange regarding utilizing Stewardship as the "Preferred Transfer Agent" to issue a letter regarding shares owned by MORENO:

> FISHOFF: "Can you send me a letter on stewardship letterhead verifying when Lorena's preferred cert 305 was originally issued on the ledger"
>
> CULBRETH-Family-Member 2: "Not now, later"
>
> FISHOFF: "later is fine"
>
> CULBRETH-Family-Member 2: "OK, let me get back to you"
>
> FISHOFF: "can you send me the letter pls?"
>
> CULBRETH: "The letter should be on APWC Letter Head. APWC is its own transfer agent. That job is being outsourced by Stewardship. "
>
> CULBRETH-Family-Member 2: "I sent you the ledger, whst else is necessary now"
>
> FISHOFF: "It needs to be on stewardship letterhead as they are defacto TA for the company like you previously when you confirmed the amount of shares she had. you need to confirm the basis date on the cert which is 8/29/14"
>
> CULBRETH-Family-Member 2: "Ryan, please send me the exact verbiage you need. In <http://need.in> it, ill send.it.back"
>
> FISHOFF: "Loreno Moreno was originally issued 850,000 preferred shares on certificate #305, in her name on August 29th, 2014,"
>
> CULBRETH-Family-Member 2: "That's it..... Perfect"
>
> FISHOFF: "yes! Thanks"

14

CULBRETH-Family-Member 2: "There it is (which included a letter on APWC letterhead which included the statement from FISHOFF's email)"

41. From in or around February 2016 to in or around February 2018, CULBRETH, FISHOFF, CULBRETH-Family-Members 1 & 2, GUMBEL and others received approximately $803,046.56 in HIPH stock sale proceeds from the fraud.

C. Undercover Period: March – September 2018

42. From on or about March 2, 2018, to on or about September 15, 2018, FISHOFF, DAVIS, STOLZ, MORENO and others solicited undercover law enforcement officials ("UCE") to secure their participation in the scheme to defraud.

a. On or about March 2, 2018, STOLZ was introduced to Individual-1. During the recorded call, STOLZ told Individual-1 that he was running a promotion for HIPH, which had a lot of stock to clear but needed cash to pay for the promotions. Individual-1 subsequently introduced UCEs to STOLZ, FISHOFF, and others.

b. From in or around March 2018 to in or around April 2018, GUMBEL, FISHOFF, CULBRETH, MORENO, CULBRETH-Family-Member 1 and STOLZ, continued to convert, deposit and sell HIPH shares while paying for and being paid to promote the stock with the proceeds of the stock sales.

c. In or around May 2018, STOLZ, FISHOFF, CULBRETH, MORENO, and DAVIS agreed that Individual-1's client, UCE-1, was to purchase $200,000 worth of stock at a discounted rate of .02¢ per share. Individual-1 was to receive a 10 percent kickback of the purchase as compensation. STOLZ was to be paid $70,000 of the $200,000 to pay the promoters and salespeople that worked in STOLZ's call room.

d. On or about May 22, 2018, STOLZ and FISHOFF exchanged emails that discussed the division of proceeds from the sale of HIPH shares to UCE-1.

15

STOLZ: "Ryan :  This is our agreed breakdown for me orchestrating the wire
200k us. My client (Individual-1) and (UCE-1) will purchase 10 million of HIPH
shares at .02 cost. 05/22/2018. From the 200,000 k wire I christian Stolz will
receive 100,000 k us following the deposit received from (Individual-1) and
(UCE-1). In addition to the 100, 000 k us I still have a opened balance of
200,000k for 6 months work completed , and a balance of 6 million shares owed
for the remainder of the year promotions."

FISHOFF: "made changes below. We are good. lets put this to bed." Within the
body of the email, FISHOFF changed the amount STOLZ would receive as a cash
payment to $70,000 and identified the promotional period for STOLZ work to end
on 12/31/2018.

e. On or about May 29, 2018, FISHOFF sent an email to STOLZ, which contained a

press release prior to its public release that said, "pr about to hit in a few hours. lets go

hard. .05/.10 this week."

f. On or about May 31, 2018, CULBRETH-Family-Members 1 & 2 caused the deposit of

11,800,000 HIPH shares into Stewardship's Alpine Securities account x3927.

g. On or about June 1, 2018, GUMBEL caused the deposit of 3,000,000 HIPH shares into

Wilson-Davis account x2260.

h. On or about June 5, 2018, MORENO caused the deposit of 9,000,000 HIPH shares

into Wilson-Davis account x2588.

i. In or around June 2018, UCE-1 told FISHOFF and STOLZ that before they would do

the $200,000 share purchase, FISHOFF and STOLZ and UCE-1 must complete two test

transactions to ensure that the brokerage firm would accept deposit of the HIPH shares

UCE-1 was supposed to buy. The test transactions would be two separate $10,000

purchases of HIPH stock.

j. On or about July 2, 2018, DAVIS, FISHOFF, and STOLZ caused UCE-1 to send a wire

transfer of $10,000 from an FBI controlled account to DAVIS controlled Bank of

America account x0456.

16

k. On or about June 13, 2018, DAVIS caused the payment of a $1,000 kickback from

Bank of America account x0456 to Individual-1 from UCE-1's $10,000 investment.

l. On or about June 14, 2018, MORENO caused the transfer of $20,162.44 of HIPH stock

sale proceeds from Wilson-Davis account x2588 to Wells Fargo Bank account x5969.

m. On or about July 26, 2018, DAVIS, FISHOFF, and STOLZ caused UCE-1 to send a

wire transfer of $10,000 from an FBI controlled account to DAVIS controlled First

Entertainment Credit Union account x1767.

n. On or about July 27, 2018, FISHOFF exchanged a series of text messages with

Individual-1 regarding the payment of a kickback for the purchase of HIPH shares by

UCE-1.

> Individual-1: "Will my wire go out today?"
>
> FISHOFF: "ill have zack take care of that."
>
> Individual-1: "Tell him to say thank you!"
>
> FISHOFF: responded "he said ur welcome most likely ull get wire
> on monday and the certs should go ut on monday as well."

o. On or about July 31, 2018, DAVIS caused the payment of a $1,000 kickback from

First Entertainment Credit Union account x1767 to Individual-1 from UCE-1's $10,000

investment.

p. The UCEs and Individual-1 ended their participation in the scheme in or around

September 2018 and did not consummate the $200,000 deal to purchase HIPH stock and

fund STOLZ's promotion of the stock.

43. From in or around March 2018 to in or around September 2018, CULBRETH,

FISHOFF, CULBRETH-Family-Member 1, MORENO, GUMBEL, STOLZ, and others received

approximately $1,183,677.54 in HIPH stock sale proceeds from the fraud.

D.     October 2018 – October 2019

44.     From in or around October 2018 to in or around October 2019, CULBRETH, CULBRETH-Family-Member 1, FISHOFF, GUMBEL, MORENO, DAVIS, and STOLZ continued to execute the scheme to defraud by continuing to deposit, sell and promote HIPH stock.

> a. On or about October 1, 2018, CULBRETH-Family-Members 1 & 2 caused the deposit of 6,000,000 HIPH shares into Stewardship's Alpine Securities account x9406.
>
> b. On or about October 3, 2018, GUMBEL caused the wire transfer of $45,735.96 of HIPH sale proceeds from Wilson-Davis account x2260 to Artstistic Ventures account x6377 at SunTrust Bank.
>
> c. On or about October 5, 2018, GUMBEL caused the payment of $10,000 from Artstistic Ventures account x6377 at SunTrust Bank to Network Newswire, with a memo line "Advertising HIPH."
>
> d. On or about November 1, 2018, CULBRETH-Family-Members 1 & 2 caused the deposit of 8,300,000 HIPH shares into Stewardship's Alpine Securities account x9406.
>
> e. On or about November 29, 2018, DAVIS caused the wire transfer of $73,000.00 into DAVIS controlled First Entertainment Credit Union account x1767 from Company 1 for the sale of HIPH shares in a private transaction.
>
> f. On or about November 29, 2018, DAVIS caused the wire transfer of $175,500.00 into DAVIS controlled First Entertainment Credit Union account x1767 from Company 1 for the sale of HIPH shares in a private transaction.
>
> g. On or about December 1, 2018, MORENO caused the deposit of 19,000,000 HIPH shares into Alpine Securities account x6468.

h. On or about November 29, 2018, DAVIS caused the wire transfer of $1,470.00 into DAVIS controlled First Entertainment Credit Union account x1767 from Company 1 for the sales of shares of HIPH in a private transaction.

i. On or about December 17, 2018, MORENO caused the deposit of a $27,136.19 check of stock proceeds from Alpine Securities account x6468 to Wells Fargo Bank account x2289.

j. On or about December 21, 2018, MORENO caused the deposit of a $18,867.69 check representing HIPH stock proceeds from Alpine Securities account x6468 to Wells Fargo Bank account x2289.

k. On or about January 16, 2019, DAVIS caused the transfer of 25,000,000 free-trading shares to Company 1.

l. On or about January 17, 2019, DAVIS caused the transfer of 25,000,000 free-trading shares to Company 1.

m. On or about May 31, 2019, FISHOFF caused the wire transfer of $7,500, $7,000 of which he received from another co-conspirator, from Kingfish Capital One account x1309 to New Age Media TD Bank account x6596.

n. On or about June 7, 2019, FISHOFF caused the wire transfer of $7,000 he received from another co-conspirator from Kingfish Capital One account x1309 to New Age Media account x6596 at TD Bank.

o. On or about June 17, 2019, FISHOFF caused the wire transfer of $7,000 he received from another co-conspirator from Kingfish Capital One account x1309 to New Age Media account x6596 at TD Bank.

19

p. On or about July 1, 2019, FISHOFF caused the wire transfer of $7,000 he received from another co-conspirator from Kingfish Capital One account x1309 to New Age Media account x6596 at TD Bank.

q. On or about August 1, 2019, FISHOFF caused the wire transfer of $7,000 he received from another co-conspirator from Kingfish Capital One account x1309 to New Age Media TD Bank account x6596.

45. From in or around April 2014 to in or around October 2019, CULBRETH, FISHOFF, STOLZ, DAVIS, CULBRETH-Family-Member 1, GUMBEL, MORENO, and HIPH received approximately $10,131,736.67 in proceeds from HIPH stock sales while HIPH's share price and trading volume were being manipulated.

46. In or around 2018, approximately 205 investors in the Northern District of Ohio, purchased, under fraudulent pretenses, approximately $219,719.59 of manipulated HIPH stock.

## COUNT 1
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 371)

The Grand Jury charges:

47. The allegations contained in paragraphs 1 through 46 are re-alleged and incorporated as though fully set forth herein.

48. From on or about October 10, 2013, to in or around October 2019, Defendants ALFRED CULBRETH, RYAN FISHOFF, CHRISTIAN STOLZ, ZACHARY DAVIS, MARK GUMBEL, LORENA MORENO, and AMERICAN PREMIUM WATER CORPORATION ("HIPH"), together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other to commit offenses against the United States, those are:

20

a.      To knowingly and willfully, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made false statements of material fact and omitting material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of HIPH securities, in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud); and

b.      To knowingly and willfully, by the use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange, for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for any such security, (a) entering an order and orders for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been and will be entered by and for the same and different parties, and (b) entering any order and orders for the sale of any such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been

21

and will be entered by and for the same and different, parties, in violation of Title 15,

United States Code, Sections 78i(a)(1) and 78ff (Manipulative Securities Trading).

## OBJECTS OF THE CONSPIRACY

49.     The objects of the conspiracy included, but were not limited to: (1) defrauding the

investors; (2) obtaining investor monies and paying and receiving undisclosed commissions; (3)

inflating the value of HIPH; and (4) enriching the conspirators.

## MANNER AND MEANS

50.     The manner and means described in paragraphs 17-28 are re-alleged and

incorporated as though fully set forth herein.

## OVERT ACTS

51.     In furtherance of the conspiracy, and to effect the objects and conceal the

existence thereof, Defendants and others performed the overt acts described in paragraphs 29-37,

38(a)-(l), 39(a)-(j), 42(a)-(p), and 44(a)-(q) among others, in the Northern District of Ohio,

Eastern Division, and elsewhere.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-9
(Securities Fraud, 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5)

The Grand Jury further charges:

52.     The factual allegations contained in paragraphs 1 through 46 are re-alleged and

incorporated as though fully set forth herein.

53.     On or about the dates listed below, in the Northern District of Ohio, Eastern

Division and elsewhere, the Defendants ALFRED CULBRETH, MARK GUMBEL, LORENA

MORENO, and others presently known and unknown to the Grand Jury, did knowingly and

willfully, directly and indirectly, by the use of the means and instrumentalities of interstates

22

commerce and of the mails, use and employ manipulative and deceptive devices and

contrivances in connection with the purchase and sale of securities by (a) employing devices,

schemes and artifices to defraud; (b) making and causing to be made untrue statements of

material fact, and omitting to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (c) engaging in

acts, practices, and courses of business which operated and would operate as a fraud and deceit

upon any persons, including members of the investing public and sellers and purchasers of the

securities in HIPH, each act below constituting a separate count.

| Count | Approximate Stock Deposit Date | Approx. Number of Shares | Ticker Symbol | Defendant(s) Charged | Proceeds of Stock Sale |
|---|---|---|---|---|---|
| 2 | January 16, 2018 | 6,000,000 | HIPH | CULBRETH | $155,309.65 |
| 3 | April 4, 2018 | 1,800,000 | HIPH | MORENO CULBRETH | $39,302.72 |
| 4 | June 5, 2018 | 9,000,000 | HIPH | MORENO CULBRETH | $168,275.31 |
| 5 | March 13, 2018 | 4,500,000 | HIPH | GUMBEL | $97,287.91 |
| 6 | June 1, 2018 | 3,000,000 | HIPH | GUMBEL | $51,046.76 |
| 7 | August 21, 2018 | 3,500,000 | HIPH | GUMBEL | $169,166.66 |
| 8 | September 7, 2018 | 13,000,000 | HIPH | CULBRETH | $789,481.82 |
| 9 | October 1, 2018 | 6,000,000 | HIPH | CULBRETH | $481,472.11 |

All in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code

of Federal Regulations, Section 240.10b-5.

COUNTS 10-13
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

54.     The factual allegations contained in paragraphs 1 through 46 are re-alleged and

incorporated as though fully set forth herein.

55.     From on or about June 13, 2018, to on or about July 31, 2018, in the Northern

District of Ohio, Eastern Division and elsewhere, the Defendants RYAN FISHOFF,

CHRISTIAN STOLZ, and ZACHARY DAVIS and others known and unknown to the Grand

Jury, knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain

money and property by means of false and fraudulent pretenses, representations, and promises.

56.     On or about the dates listed below, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendants listed below, for the purpose of executing and attempting to

execute the foregoing scheme and artifice, transmitted and caused to be transmitted, writings,

signs, signals, pictures, and sounds by means of wire and radio communication, in interstate

commerce, to wit: electronic communications and electronic transfers of funds which Defendants

and others caused to be sent, and received, as described below, each wire communication or

transfer of funds constituting a separate count of this indictment:

| Count | Approximate Date | Approximate Amount | Originating Bank | Receiving Bank | Defendants Charged |
|-------|------------------|--------------------|------------------|----------------|--------------------|
| 10 | June 13, 2018 | $1,000 | Bank of America | Fifth Third Bank | DAVIS, FISHOFF, STOLZ |
| 11 | July 3, 2018 | $10,000 | PNC Bank | Bank of America | DAVIS, FISHOFF, STOLZ |
| 12 | July 26, 2018 | $10,000 | PNC Bank | First Entertainment Credit Union | DAVIS, FISHOFF, STOLZ |
| 13 | July 31, 2018 | $1,000 | First Entertainment Credit Union | Fifth Third Bank | DAVIS, FISHOFF, STOLZ |

All in violation of the Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE

The Grand Jury further alleges:

53.     The allegations of Counts 1 through 13 are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  As a result of the foregoing offenses, Defendants AMERICAN PREMIUM WATER CORPORATION ("HIPH"), ALFRED CULBRETH, RYAN FISHOFF, CHRISTIAN STOLZ, ZACHARY DAVIS, MARK GUMBEL, LORENA MORENO, shall forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds traceable to the violations charged in Counts 1 through 13.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.

25

United States v. American Premium Water Corporation, et al.

A TRUE BILL.

_____
FOREPERSON

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By: _____
Michael L. Collyer
Chief, White Collar Crimes Unit